UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

COLLEEN BEEMAN,

                           Plaintiff,

        -against-                                              5:14-cv-0593 (LEK)

CAROLYN W. COLVIN,
Commissioner of Social Security,

                           Defendant.
_____

## DECISION and ORDER

## I.      INTRODUCTION

        This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 15 ("Plaintiff's Brief"); 22 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

## II.     BACKGROUND

        On October 26, 2011, Plaintiff Colleen Beeman ("Plaintiff") filed an application for Social

Security Disability Income ("SSDI") under the Social Security Act.  Dkt. No. 11 ("Record") at 11;[1]

Pl.'s Br. at 2.  Plaintiff alleged disability due to lower back and neck injuries, arthritis, diabetes, and

anxiety beginning March 1, 2006.  R. at 153, 157.  The claim was initially denied on February 17,

2012, and on March 29, 2012, Plaintiff filed a timely request for a hearing.  R. at 11.

Administrative Law Judge ("ALJ") Brian W. Lemoine ("Lemoine") held a video hearing on August

10, 2012 and issued an unfavorable decision on November 29, 2012.  R. at 22, 31.  Plaintiff

_____

[1] Citations to the Record are to the pagination assigned by the SSA.

appealed the ALJ's decision, and the Appeals Council denied review on April 29, 2014, R. at 1. Plaintiff commenced the instant action on May 19, 2014. Dkt. No. 1 ("Complaint").

**A. Plaintiff's Medical Records**

Plaintiff was born on October 31, 1971. R. at 142. Plaintiff resides with her two sons. R. at 143. Immediately before her claimed disability, she worked full-time as an administrative assistant from February to March 2006. R. at 158. Before that, she had held jobs as a cashier, delivery driver, receptionist, and in food preparation. Id.

During a visit to Dr. Karl Hafner ("Dr. Hafner"), Plaintiff's primary care physician, on September 23, 1999, Plaintiff mentioned pain in her left thumb as well as numbness in her hand and wrist. R. at 269. Dr. Hafner suspected that it was tendonitis and prescribed Naprosyn. Id. On February 21, 2000, Dr. Hafner treated Plaintiff for knee problems, specifically aches, tightening, and reported instances where "they give way." R. at 270. Dr. Hafner noted that Plaintiff had lost significant weight and recommended that Plaintiff commence physical therapy. Id. Four days later, Plaintiff met again with Dr. Hafner, stating that there was pain and numbness in her left leg, and that the pain was a daily occurrence. Id. She also noted that she felt depressed, was not sleeping, and felt prone to emotional swings, particularly in the past month. Id. Platintiff was prescribed Wellbutrin for her depression. R. at 329. Dr. Hafner switched Plaintiff's medication from Wellbutrin to Paxil on May 26, 2000 and from Paxil to Serzone on November 21, 2000 after further indications that her symptoms of depression were not improving. R. at 325, 328. Plaintiff was also prescribed Prilosec on June 2, 2000 after having symptoms of acid reflux disease. R. at 328.

On December 18, 2001, Dr. Hafner saw Plaintiff again regarding symptoms of depression as well as pain in her right wrist and acid reflux symptoms. R. at 274. Dr. Hafner assessed Plaintiff's

wrist pain as DeQuervain's Tenosynovitis and prescribed Naprosyn.  Id.  He also re-prescribed

Prilosec for her acid reflux symptoms and Prozac for her depression.  Id.  At a follow-up

appointment on January 15, 2002, Plaintiff stated that the Prozac and the Prilosec were helping.  Id.

However, she also noted that she had significant pain up and down her left arm to the extent that she

could not pick up her left arm, and that the Naprosyn had not been effective in relieving the pain.

Id.  Dr. Hafner referred Plaintiff to physical therapy and ordered an electromyogram ("EMG"),

which was later cancelled.  R. at 275, 322.  On March 8, 2002, Plaintiff returned to Dr. Hafner and

indicated that her arm pain had subsided but that three fingers on her left hand were numb.  R. at

275.  Dr. Hafner once again scheduled Plaintiff for an EMG appointment.  Id.

On June 13, 2002, Plaintiff saw Dr. Hafner regarding her right ear.  R. at 276.  She stated

that she could not hear out of it and that it hurt.  Id.  She noted that this had happened in March, but

that it had resolved on its own.  Id.  Dr. Hafner prescribed Amoxicillin and Nasonex.  Id.  Plaintiff

discussed similar pain during an October 28, 2002 visit, which she described as on the right side of

her face.  Id.  She also stated at this time that the Prozac had stopped working.  Id.

Dr. Hafner reported at a December 13, 2002 appointment that Plaintiff had been having

lower back discomfort, and that she had a history of such issues.  R. at 319.  Plaintiff denied that the

pain was radiating down her legs in any way.  Id.  Dr. Hafner prescribed Mobic and advised Plaintiff

to alter her activities accordingly.  Id.  At an appointment with Dr. Hafner on October 13, 2003,

Plaintiff noted that her lower back discomfort had dissipated.  R. at 279.  She complained of further

hearing problems regarding her right ear and also mentioned that she was having trouble sleeping.

Id.  Plaintiff was prescribed Effexor and referred to an otolaryngologist for her ear.  Id.  Dr. Hafner

also noted that Plaintiff had separated from her husband shortly before this visit.  Id.  Plaintiff

reported a significant positive change from the Effexor at a follow-up on December 4, 2003.  R. at 280.

Plaintiff returned to Dr. Hafner on January 2, 2004 after slipping on ice, hitting her head on her car, and landing on her back on December 13, 2003.  R. at 281.  She stated that it hurt to sit and that she had been getting regular headaches.  Id.  Dr. Hafner doubled her dose of Effexor and told her to follow up if she did not feel better over the coming months.  Id.  At a follow-up appointment on August 19, 2004, Plaintiff stated that her headaches had improved, with the pain "down to a four," and that she was comfortable not pursuing further treatment.  R. at 283.

On October 1, 2004, Plaintiff stated that her left knee issues had returned.  R. at 284.  Dr. Hafner noted that her left foot was significantly flatter than her right foot.  Id.  An X-ray showed that Plaintiff had a bone spur in her left heel, but X-rays on her left knee were negative.  Id.  Dr. Hafner referred her to a podiatrist and prescribed Naprosyn but did not initiate further treatment regarding her left knee.  Id.

Plaintiff fractured her left fifth finger in early 2003.  R. at 360; see also R. at 353 (confirming fracture through X-ray).  Plaintiff met with Dr. Hafner on November 29, 2004 regarding recovery from that fracture.  R. at 285.  Dr. Hafner noted that an X-ray had shown proper healing, and he referred Plaintiff back to the surgeon for further treatment.  Id.  Dr. Hafner also mentioned that Plaintiff had been previously diagnosed with carpal tunnel syndrome.  Id.  On January 20, 2005, Plaintiff discussed that she was finding it difficult to lift at work due to pain in her right hand.  R. at 286.  Dr. Hafner noted that an EMG had registered unspecified abnormal results and referred her to a specialist and put together a note for her employer.  Id.  Dr. Hafner worried that "at the restrictions that she probably needs they may say there is no work for her."  Id.  He also stated that her balance

4

issues appeared indicative of vertigo.  Id.

Plaintiff saw Dr. Hafner due to a cold with a cough on January 17, 2006.  R. at 305.  Dr. Hafner observed that she had been using Tessalon for the cough based on prior appointments on June 17 and September 30, 2005 but decided to rely on cold medicines instead.  Id.  Dr. Hafner noted that Plaintiff had a history of COPD that might have been related to the cough.  Id.  On January 20, 2006, Plaintiff and Dr. Hafner agreed that Plaintiff should quit smoking, and Dr. Hafner prescribed an albuterol inhaler as well as Zyban and nicotine patches.  R. at 304.

On July 24, 2007, Plaintiff complained of panic attacks, noting that she had had three episodes.  R. at 290.  She stated that her gynecologist had stopped the Effexor and had placed her on Celexa instead.  R. at 303.  Dr. Hafner doubled her dosage of Celexa but did not grant Plaintiff's request to switch to Xanax due to concerns regarding addiction.  Id.  Plaintiff stated at a March 17, 2008 appointment that she had fallen on her backside a month prior.  R. at 291, 302.  She noted that her condition had been improving but had gotten much worse recently, and that she could not bend fully.  Id.  Plaintiff stated that the pain was rated around a four out of ten, and that pain and numbness ran down her legs to her feet.  R. at 302.  Dr. Hafner determined, after an X-ray, that Plaintiff suffered from lumbar radiculopathy but noted only minimal degenerative change.  R. at 302, 348.  Plaintiff requested a sleeping aid to help sleep through the pain as well as a change of antidepressants.  R. at 291.  Dr. Hafner prescribed Neurontin and Elavil.  R. at 302.  On May 23, 2008, Plaintiff was assessed to have a further exacerbation of her COPD/asthma, for which Dr. Hafner prescribed prednisone, Advair, and albuterol.  R. at 295.  Dr. Hafner also noted that Plaintiff claimed a return of her right ear pain as well.  Id.

Plaintiff's right arm started experiencing pain in her right arm in December 2008, and on

December 20, 2008, she met with Dr. Sanjeev Verma ("Dr. Verma") after a CT scan. R. at 434. Dr. Verma noted that Plaintiff was having difficulty turning her neck to the right. Id. The scan indicated that there was slight herniation at the C4-5 vertebrae. R. at 345, 434. Furthermore, Plaintiff's right side presented signs of mastoiditis. R. at 434. Dr. Verma prescribed Plaintiff Vicodin and antibiotics. R. at 435. Dr. Hafner reviewed the results of the CT scan with Plaintiff on December 29, 2008. R. at 296, 429. Dr. Hafner also confirmed that Plaintiff's pain and range of motion were both worse when she tilted her head to the right. R. at 296. Plaintiff became combative with Dr. Hafner when he expressed concern about increasing the dosage of her current medication and was asked to leave the office. Id.

Plaintiff visited Joanne Lomber ("Ms. Lomber"), a nurse practitioner working under her new primary care physician, Dr. Dilip Roy ("Dr. Roy"), on January 4, 2010, stating that she had significant lower back pain. R. at 427. Ms. Lomber observed that Plaintiff's back was tender and referred her to an orthopedic specialist. Id. At a February 2, 2010 appointment, Plaintiff discussed a return of her right ear pain with Ms. Lomber. R. at 428. Ms. Lomber noted that her ear was swollen and some discharge was occurring. Id.

On March 22, 2010, Plaintiff visited Dr. John Cambareri ("Dr. Cambareri") at Syracuse Orthopedic Specialists upon the referral of Dr. Roy to discuss lumbar pain that radiated to her left side. R. at 259. Plaintiff claimed that this had been a problem for slightly over a year, but that she had a history of back pain dating back more than ten years. R. at 260. She claimed that the pain was moderate and getting worse, and that it consisted of "aching, soreness and sharp" pains. R. at 259. She stated that NSAIDs and pain medication generally relieved the pain. Id. Dr. Cambareri reported that Plaintiff had a medical history of anxiety and COPD, and that she smoked one and a

6

half packs per day. R. at 259-60. Dr. Cambareri recommended an MRI and prescribed Darvon. R. at 262. The results of the MRI, dated April 2, 2010, indicated degenerative disc disease in the L5-S1 junction. R. at 263, 265-66.

On April 9, 2010, Dr. Cambareri discussed the results of the MRI with Plaintiff. R. at 258. Dr. Cambareri determined that surgery was unlikely to help and recommended more conservative forms of treatment. Id. Plaintiff returned to Dr. Cambareri on June 28, 2010 to discuss her MRI in more detail. R. at 254, 430. Plaintiff stated that at that time, her pain was moderate and mild and centered on the left side of her back radiating down to her left knee, and she described it as "aching and soreness." R. at 255. She noted that sitting or bending made the pain worse, and that NSAIDs had helped with the pain. Id. Dr. Cambareri diagnosed Plaintiff with lumbosacral radiculitis and a herniated disc. R. at 256. Plaintiff expressed that she would seek treatment at a pain clinic. R. at 257.

At a January 19, 2011 visit, Dr. Mahesh Kuthuru ("Dr. Kuthuru") fully evaluated Plaintiff's condition. R. at 469. Plaintiff's pain was centered on the lower back and radiated down the left leg "with numbness, and sharp shooting pains." Id. Plaintiff rated her pain as an eight out of ten and stated that it was constant. Id. Her pain was made worse by "walking, sitting, standing, lifting, prolonged activity and twisting" but could be alleviated by "lying down, sitting, massage and medication." Id. Plaintiff reported being prescribed Darvocet, Vicodin, Neurontin, Voltaren ER, Robaxin, and Hydrocodone as well as undergoing physical therapy. Id. Dr. Kuthuru recommended further X-rays, an increase in Plaintiff's Hydrocodone dosage, balance testing, hot and cold packs, and home exercise focusing on flexibility and range of motion. R. at 472-73.

Plaintiff met with Ms. Lomber on August 4, 2011 as a result of "throbbing shooting pain" in

her right ear.  R. at 425.  At an October 6, 2011 for a follow-up on her ear infection, Ms. Lomber

noted Plaintiff's complaints of continued anxiety and foot pain; Plaintiff had been wearing a boot on

her right foot since X-rays were taken in August.  R. at 406.

On October 4, 2011, Plaintiff visited Dr. Mahender Goriganti, ("Dr. Goriganti") a physical

medicine and rehabilitation specialist who worked with Dr. Kuthuru, for her back and neck pain.  R.

at 36, 454.  She described the pain as "heavy, burning, achy and throbbing" and rated the pain as

between five and eight out of ten.  Id.  Sitting and standing both made the pain worse, although heat,

ice, lying down, massage, and medication all helped.  Id.  Plaintiff had tried physical therapy,

chiropractic care, and medication, including Vicodin, Soma, and Voltaren, to control the pain in the

past.  Id.  Plaintiff also reported fatigue, anxiety, joint pain, and numbness in her extremities.  Id.

Dr. Goriganti observed that Plaintiff had tenderness around her back and neck.  Id.  Dr. Goriganti

diagnosed Plaintiff with lumbago, cervical root lesions, and other disorders of Plaintiff's bursae and

tendons in the shoulder region.  R. at 454-55.  He ordered an X-ray and an MRI.  R. at 455.  The X-

ray was carried out on November 14, 2011.  R. at 357.  The X-ray found mild curvature of the

lumbar spine and degenerative disc disease at every lumbar level, most prominently at the L5-S1

junction.  Id.  At a follow-up on November 15, 2011, Dr. Goriganti recommended a continuation of

Plaintiff's pain medication and the use of heat and cold compacts to help relieve pain.  R. at 453.

Plaintiff returned to Dr. Goriganti on December 16, 2011 stating that "her neck went out again."  R.

at 449.  Dr. Goriganti noted that the pain averaged around seven out of ten and was "heavy, burning,

achy and throbbing."  Id.  He recommended preserving the treatment plan as it stood.  R. at 450.  At

a follow-up visit on January 31, 2012, Plaintiff stated that nothing had improved.  R. at 447.  Dr.

Goriganti declined to change the treatment plan.  R. at 448.

Plaintiff completed a Function Report on November 28, 2011. R. at 177. Plaintiff described her daily routine as getting her kids up for school, doing dishes, doing laundry, resting, making dinner, further resting, and helping her kids with homework. R. at 166. In addition to caring for her children, she stated that she took care of her grandmother's finances. Id. She also cared for pets but stated that her children helped with those duties. Id. She specifically listed sleeping through the night and sitting and standing for extended periods as things she could no longer do due to her pain. Id. She stated that she had difficulty tying shoes and was unable to stand long enough to shower. Id. Her cooking was limited to simpler meals and meals that could be prepared in a slow cooker, and she did not bake anymore as a result of her pain. R. at 167-68. Both mowing and raking the lawn were too much of a strain on her neck. R. at 168. She stated that she was able to leave the house, which she did primarily to buy groceries, and was able to manage her money. R. at 168-69. She listed reading as one of her hobbies, but noted that she could not hold a book for long periods due to shoulder and neck tightness. R. at 169-70. She reported watching TV and taking her children to the park. R. at 169. Before the onset of her symptoms, Plaintiff would go to bingo two to three times per week and to dance but was unable to do either anymore. R. at 170.

Lifting a laundry basket would affect her neck and radiate pain through Plaintiff's shoulder. Id. If she held the same position for more than thirty minutes, her left leg would go numb and her pain would spread to her hip. Id. Walking short distances was not problematic, and taking stairs slowly was feasible, but even sitting would require the ability to stand and shift if her back tightened. R. at 170-71. Walking more than sixty to seventy-five feet at a time would require her to stop and rest for a few minutes. R. at 172. She could not kneel, rise from squatting, or reach over her head. R. at 171. Plaintiff described her pain, which she had first experienced more than ten

years prior, as a constant ache, like a "toothache," that would be sharp and at times and shoot to her left hip and down her left leg. R. at 173. She stated that her neck pain would radiate to her shoulders in a "burning shooting pain." Id. She stated that her prescriptions for Hydrocodone and Naprosyn helped with the worst of the pain for an hour or two, and that Flexeril relaxed her enough to help her fall asleep. R. at 174. She noted that she used ice packs and a heating pad to help with the pain. R. at 175.

Plaintiff also reported anxiety issues, which had first presented themselves about two and a half years prior. Id. She mentioned her pain, her deceased grandfather, and her inability to take care of her family as triggers. R. at 176. She described weekly anxiety attacks as involving sweating, crying, and "fear of something bad happening" and lasting for thirty to sixty minutes. Id. When an anxiety attack would happen, Plaintiff would take a Xanax and go outside to calm down, which would make her anxiety less severe. Id.

Plaintiff was evaluated by Dr. Marilee Mescon ("Dr. Mescon") on February 3, 2012. R. at 359. Dr. Mescon noted Plaintiff's ten-year history with lower back pain. Id. Plaintiff described her back pain as "burning." Id. The pain radiated to both hips as well as to the left foot, and Plaintiff reported numbness in both feet. Id. Plaintiff also noted neck pain that started after turning her head quickly while driving. Id. Her neck pain was described as "sharp" and "burning," and was worse when she turned her head toward her right. Id. Scans showed that she had two herniated discs in the back of her neck. Id. Plaintiff reported that medication brought both her back and neck pain from a seven out of ten to a five. Id.

Dr. Mescon noted Plaintiff's diabetes, for which she had never been hospitalized. R. at 360. Plaintiff reported that she was always very thirsty and that when her blood sugar levels were

particularly high, her vision would become blurry.  Id.  Plaintiff noted that she was able to care for herself and her children but that other family members typically cleaned.  Id.  Dr. Mescon observed Plaintiff walking normally and that she was able to squat, sit, and stand without trouble.  R. at 361. She also noted that Plaintiff's range of motion was not severely limited.  Id.  However, Plaintiff had diminished sensation in her legs and diminished motor strength in each extremity.  Id.  Dr. Mescon diagnosed Plaintiff with radiculopathic neck pain, radiculopathic back pain with arthritis, gastroplasty, diabetes, and neuropathy and noted that Plaintiff's long-term prognosis is fair to poor. R. at 362.  She assessed Plaintiff's ability to sit or stand for short periods of time as not limited but expected that Plaintiff may have moderate limitations on her ability to climb, push, pull, or carry heavy objects.  Id.

Plaintiff underwent a psychiatric examination with Dr. Dennis Noia ("Dr. Noia") on February 3, 2012.  R. at 365.  Dr. Noia recorded Plaintiff's nightly difficulty falling asleep and staying asleep as well as panic attacks approximately three times per month.  R. at 365-66.  While Plaintiff had improved with medication, her symptoms still persisted.  R. at 366.  Plaintiff also reported that she was able to care for herself, drive and take public transportation, handle her finances, and do household chores.  R. at 367.  However, she noted that she had to take frequent breaks while doing chores.  Id.  Dr. Noia diagnosed Plaintiff with panic disorder, not otherwise specified, and recommended that pharmacological treatment continue in conjunction with regular intervention and support.  R. at 368.

On February 13, 2012, Dr. M. Apacible ("Dr. Apacible") prepared a Psychiatric Review Technique and Mental Residual Functional Capacity ("RFC") Assessment.  R. at 369, 373.  In the Psychiatric Review Technique, Dr. Apacible noted that the impetus for the Mental RFC Assessment

11

was depression, by history, and panic disorder not otherwise specified. R. at 376, 378. Dr. Apacible found that Plaintiff had moderate limitations in her ability to understand, remember, and carry out detailed instructions; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting; but no significant limitations in any other mental activities. R. at 369-70. Dr. Apacible further noted that Plaintiff alleged depression but appeared in all aspects in the consultation to be able to socialize, perform simple and complex work, and care for herself and her children. R. at 371. Of the four areas of functional limitation, Dr. Apacible found only a mild limitation in maintaining concentration, persistence, or pace. R. at 383. In the areas of restriction of activities of daily living and maintaining social functioning, Dr. Apacible found no limitation, and he also found no repeated episodes of decompensation. Id. Furthermore, the evidence presented did not establish the presence of C criteria under either the affective or anxiety-related disorder categories. R. at 384.

Plaintiff returned to Dr. Goriganti on April 3, May 11, June 8, July 10, and August 7, 2012. R. at 456-65. Plaintiff's symptoms were generally unchanged at each visit other than on May 11, 2012, when she rated her pain at a ten out of ten. R. at 458. Dr. Goriganti, both at this visit and the others, recommended a continuation of the same treatment plan. R. at 457-65.

Dr. Goriganti, with Terry Salmonsen, a family nurse practitioner, completed a Medical Source Statement for Plaintiff on August 7, 2012. R. at 466. Plaintiff was assessed to be able to carry ten pounds or less on either an occasional or a frequent basis. Id. The Statement also estimated that Plaintiff could not sit or stand continuously for one hour or more and would need to lay down and elevate her feet throughout the day at an unpredictable frequency. Id. With regard to postural activities, Plaintiff was determined to be able to occasionally kneel, crouch, crawl, or stoop,

but never able to balance or climb.  Id.  Plaintiff's back and neck pain was estimated to cause her "to be off-task for at least 25% of the time in an 8-hour workday."  R. at 468.  Her pain also would likely be responsible for good days and bad days and cause at least four days of absences from work per month.  Id.

## B. ALJ Hearing

Plaintiff testified at a hearing before ALJ Lemoine on August 10, 2012.  R. at 31.  She stated that the herniated discs in her lower back have "caused damage" and "led to arthritis."  R. at 38. She noted that both standing and sitting caused a lot of pressure on her back, and that after fifteen minutes of sitting, she was often in significant pain.  Id.  She mentioned that she had been prescribed Xanax for anxiety and that she also had diabetes.  R. at 39.  In 1999, she had worked as a receptionist at a mobile home dealer, where she would have to sit for a half hour at a time.  R. at 41-42.  She stated that she would not be able to do that job today, because sitting for that length of time would not be feasible.  R. at 42.  Plaintiff worked part-time at a sub shop in 2001, where during busy periods she would have to stand for an hour or two in between breaks.  R. at 41.  She had been a cashier as recently as 2005, but she went on leave for carpal tunnel surgery, and there were no positions open when she was cleared to return.  R. at 40.  Plaintiff clarified that her carpal tunnel syndrome had been successfully resolved with surgery.  Id.  After that, she had held an administrative assistant job for two months but found that she was unable to sit for sufficient amounts of time.  R. at 39-40.

Plaintiff's pain was centered on her lower back, and radiated to her left side and down her left leg.  R. at 42.  Her left leg would go numb "about four to five times a day" for "at least a half hour to an hour."  Id.  Typically, after standing up, Plaintiff would be unable to walk and would

13

need a few minutes before being able to move and stretch.  Id.  Plaintiff rated her back pain as a

seven or eight out of ten, but she stated that pain medication generally helped enough for her "to

have minimal function."  R. at 43-44.  She said that roughly three to four days a week, her pain

would be markedly worse.  R. at 44.  On a daily basis, Plaintiff would have weakness in her left leg

that would require her to steady herself on an object of furniture, or her leg would buckle.  Id.

Plaintiff also had a herniated disc in her neck that caused throbbing pain that would shoot into her

shoulder.  R. at 43.  Plaintiff rated this pain as a five out of ten, and stated that roughly three to four

days a week, this pain would be markedly worse.  R. at 43-44.

When Plaintiff took her medication, she rated her pain at about a five in her back and a four

in her neck.  R. at 57.  She did not identify any side effects from her medications.  Id.  Her primary

pain medication was Hydrocodone, which she had been prescribed for roughly two years.  R. at 57-

58.  Plaintiff's pain was severe enough that she would have trouble concentrating on a regular basis.

R. at 45.  She would be unable to focus on reading, writing, or watching television.  Id.  She also felt

the effects of neuropathy, explaining that her toes would go numb constantly and that she would

have to use a heating pad for her feet on a daily basis to warm them up, even during the summer.  R.

at 46.  Plaintiff's anxiety would also impact her life once or twice per week.  Id.  The anxiety could

be triggered by her pain or other stress, including her children.  R. at 47.  Plaintiff also reported

having regular trouble sleeping through the night, usually waking up every hour in order to shift

positions.  Id.

Plaintiff described her routine for getting up in the morning, which involved stretching her

back in bed before slowly sitting up and sitting for a few minutes to ensure her legs were not numb.

R. at 48.  Plaintiff typically did the laundry but relied on her children to transfer clothes to the dryer

14

and to carry the clean laundry to the kitchen to be folded. R. at 49. Afterward, she would typically alternate between sitting and lying down, which she would have to do six to eight times a day for fifteen to twenty minutes at a time. Id. She would only be able to sit in her padded office chair for fifteen minutes at a time. R. at 50.

Plaintiff discussed her ability to do household chores, including washing dishes. R. at 50-51. She stated that she could stand and do the dishes for only ten minutes at a time. R. at 50. Her neck issues prevented her from reaching upper cupboards, and her back issues required her to squat instead of bending down to reach lower cupboards. R. at 50-51. Plaintiff noted that she was unable to bend at the waist. R. at 51. While she was able to vacuum, sweeping and mopping were not feasible for her because the motion of turning the broom or mop caused pain and muscle spasms. Id. When vacuuming, she would typically have to rest for fifteen minutes between rooms. R. at 52. Plaintiff was able to grocery shop as long as the list was not particularly long and she could complete the trip within thirty minutes. Id. A longer trip would run the risk of significant pain and muscle spasms, even while leaning on the shopping cart, so her mother would handle larger trips. R. at 52-53. Plaintiff would not be able to carry the groceries herself; the store employees had to bring them to her car, and her children would bring them in from the car. R. at 53. Plaintiff typically cooked, but if cooking took more than ten minutes, she would have to take a break and sit down to "take the pressure off my spine." Id. She liked to read, but it was difficult because reading would either require her to tilt her neck downward or to hold a book up, either of which would aggravate her neck pain. R. at 53-54.

Plaintiff worked in 2011 selling Avon products. R. at 58. She spent no more than ten hours a week working and was mostly on the phone with potential customers. Id. Her children typically

handled the products ordered when they arrived, and her mother delivered the orders. R. at 58-59. Longer phone calls required Plaintiff to toggle the speaker phone and stand up to stretch. R. at 59. On days where Plaintiff's pain was worse, she did not do any work. Id. Plaintiff stated that she typically made $300 per month before expenses. R. at 60.

Plaintiff indicated that she was sitting with her arms on the armrests to take some of the pressure off her back, and that this would be necessary for a job where she would have to sit for longer than fifteen minutes continuously. R. at 54-55. She would be able to walk for five to ten minutes continuously, but after that, she would have to sit for at least fifteen minutes. R. at 55-56. She cited the walk from the parking lot to the hearing building that morning, which was roughly one city block, as an example, as she had to rest in the middle of the walk, which took her about fifteen minutes. R. at 56. Plaintiff could carry roughly ten pounds, but she would not be able to carry them for a distance. R. at 56-57. She typically bought things, like milk and laundry detergent, in smaller sizes because they were lighter and easier to handle. R. at 49, 57.

Plaintiff stated, upon questioning from ALJ Lemoine, that she had completed an associate's degree in 2010. R. at 60. She attended classes two to three days a week, leaving classes and walking in the hallway after stretching her back. R. at 60-61. Her class blocks were no longer than fifty minutes at a time. R. at 62-63. She would drive five minutes to the campus and sometimes would have to carry books to class. R. at 61. Plaintiff also confirmed to ALJ Lemoine that she was on diabetes medication but was not receiving active treatment for diabetes or for her mental health concerns. R. at 62.

### C. Procedural History

ALJ Lemoine issued an unfavorable decision on November 29, 2012. R. at 22. While ALJ

16

Lemoine found that Plaintiff had not engaged in substantial gainful activity and that she had chronic lower back pain with a herniated disk as well as obesity, R. at 13, none of her other impairments, such as diabetes, carpal tunnel syndrome, and panic disorder, were determined to be severe impairments. R. at 13-14. ALJ Lemoine further determined that Plaintiff did not have a combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), giving specific consideration to Listing 1.04, disorders of the spine. R. at 16; 20 C.F.R. § 404.1520(a)(4)(iii). ALJ Lemoine found that Plaintiff had the RFC to perform the full range of sedentary work in 20 C.F.R. § 416.967(a), as he found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms not consistent with the rest of the record. R. at 16-19. Accordingly, ALJ Lemoine concluded that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. R. at 21-22. Therefore, Plaintiff was not disabled under the Social Security Act since October 26, 2011, the date the application was filed. R. at 22.

## III. LEGAL STANDARD

### A. Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if the decision is supported by substantial evidence in the Record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if

it might justifiably have reached a different result upon a *de novo* review.'" <u>Sixberry v. Colvin</u>, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984)).  However, the Court should not uphold the ALJ's decision when it is supported by substantial evidence, but it is not clear that the ALJ applied the correct legal standards.  <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

### B.  Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  An individual seeking disability benefits "need not be completely helpless or unable to function."  <u>De Leon v. Sec'y of Health & Human Servs.</u>, 734 F.2d 930, 935 (2d Cir. 1984) (quoting <u>Gold v. Sec'y of Health, Educ. & Welfare</u>, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).  In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(1).  In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA.  <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008) (quoting <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996)).  If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends.  20 C.F.R. § 404.1520(a)(4).  Otherwise, the SSA will proceed to the next step.  <u>Id.</u>

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If it does, the claimant is not disabled under SSA standards.  <u>Id.</u>  At step two, the SSA considers whether the claimant has a severe

medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509.  Id. § 404.1520(a)(4)(ii).  If he or she does not have such an impairment, the claimant is not disabled under SSA standards.  Id.  At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I.  Id. § 404.1520(a)(4)(iii).  If it does not, the SSA moves on to step four to review the claimant's RFC and past relevant work.  Id. § 404.1520(a)(4)(iv).  The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work.  Id.  If the claimant cannot perform his past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity.  Id. § 404.1520(a)(4)(iv).  If appropriate work does not exist, then the SSA considers the claimant to be disabled.  Id.

## IV.    DISCUSSION

Plaintiff argues that the Commissioner's final decision was not based on substantial evidence because the ALJ (1) did not properly assess Plaintiff's credibility; (2) failed to properly develop, assess, and weigh the medical evidence, and (3) erroneously referred to a nurse practitioner as a non-medical source.  Pl.'s Br. at 7-15.

### A.  Plaintiff's Credibility

ALJ Lemoine found that Plaintiff's descriptions of her symptoms could be reasonably expected from her medically determinable impairments.  R. at 19.  However, he did not credit Plaintiff's statements to the extent that they surpassed the RFC assessment.  Id.  ALJ Lemoine pointed to several factors that supported his credibility finding.  First, Plaintiff's work history prior

to her alleged onset date was poor.  Id.  Second, Plaintiff's work history with Avon was inconsistent

with Plaintiff's own allegations of her symptoms.  Id.  Third, Plaintiff was able to obtain an

associate's degree and stated that she could move and carry her books as needed.  Id.  Fourth,

Plaintiff's treatment was far more conservative than would be necessary if her disability was as

serious as claimed.  Id.  Fifth, Plaintiff's daily living activities showed an ability for her to function

with only minor limitations.  Id.  Sixth, ALJ Lemoine's observations of Plaintiff were that she was

not in obvious pain or discomfort, and she was able to rise from her chair at the end of the hearing

without any difficulty.  Id.

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility in two ways: (1) he

mischaracterized Plaintiff's demeanor during the hearing due to a lack of video recording, and (2)

he gave unwarranted consideration to Plaintiff's work as an Avon representative despite her limited

work for Avon.  Pl.'s Br. at 9-10.  Plaintiff specifically objects to ALJ Lemoine's characterization of

her appearance at the hearing and her lack of obvious pain or discomfort as sufficient reasons to

doubt her credibility.  Id. at 9.  Defendant notes that an ALJ is allowed to include their observations

of a claimant at the hearing in determining credibility, and that an ALJ can also consider Plaintiff's

work for Avon in determining her credibility.  Def.'s Br. at 10.

Defendant correctly points out that an ALJ's observations of a claimant are allowed to

influence the ALJ's credibility analysis.  SSR 96-7p, 1996 WL 362209 (S.S.A. 1996).  Since in-

person hearings are not videotaped, Plaintiff's claim that the lack of a recording caused her

prejudice is not cognizable.  Further, the Court must judge the ALJ's decision on a substantial

evidence standard.  Sixberry, 2013 WL 5310209, at *3.  Therefore, there must merely be reasonable

support for ALJ Lemoine's finding, and Plaintiff's testimony regarding her work with Avon could

reasonably support Plaintiff having "a greater residual functional capacity than alleged." R. at 19. Given that Plaintiff's work history is a relevant part of the credibility determination, Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998), ALJ Lemoine's consideration of Plaintiff's work for Avon was proper. As a result, Plaintiff's specific objections to ALJ Lemoine's credibility finding are denied.

The Court also will address whether ALJ Lemoine's credibility finding was not based on substantial evidence. "ALJs are specifically instructed that credibility determinations should take account of 'prior work record.'" Schaal, 134 F.3d at 502 (quoting SSR 96-7p). The extent of prior work history can weigh in favor of or against a finding of credibility, either by showing that a plaintiff has been truly struggling to find appropriate work or by showing that a plaintiff does not have significant motivation to work. Id. However, as "[a] claimant's failure to work may stem from her inability to work as easily as her unwillingness to work," the Second Circuit has cautioned that such an inquiry "must be undertaken with great care." Id. Therefore, an ALJ should only infer "a weak attachment to the work force" from a claimant's prior work record when a lack of employment cannot be explained adequately. Woodside v. Comm'r of Soc. Sec., No. 14-cv-1234, 2016 WL 796075, at *6 (N.D.N.Y. Feb. 23, 2016). In this case, ALJ Lemoine's analysis of Plaintiff's work history omits the fact that Plaintiff separated from her husband in 2003, prior to which she may not have been the head of her household. R. at 279. Plaintiff's work history is more sporadic before 2003 when compared to the period of time between 2003 and her claimed disability date. R. at 158. ALJ Lemoine has not noted these differences in Plaintiff's work history, merely mentioning a "poor work history prior to her alleged onset date." R. at 19. This calls into question whether he has undertaken this analysis with the required "great care."

21

This error, however, is harmless.  See Medovich v. Colvin, No. 13-cv-1244, 2015 WL 1310310, at *2 (N.D.N.Y. Mar. 23, 2015) (denying a remand when error was harmless).  Given the significant number of other factors that ALJ Lemoine has found in support of his determination of Plaintiff's credibility, and mindful of the deferential standard upon review, the Court finds that the ALJ's finding of Plaintiff's limited credibility is based on substantial evidence and thus not subject to remand.

### B.  Development, Assessment, and Weighing of Medical Evidence

In considering the opinions on the record, ALJ Lemoine assigned great weight to Dr. Kuthuru and Dr. Mescon.  R. at 20.  He further assigned great weight to portions of Dr. Goriganti's opinion as far as he stated that Plaintiff could lift and carry items weighing ten pounds and had no limitations with respect to reaching, handling, fingering and feeling.  Id.  However, he assigned little weight to Dr. Goriganti's opinion that Plaintiff could only sit for short periods, stand or walk for one hour of an eight-hour day, and never or occasionally kneel, crouch, crawl, stoop, climb, or balance. Id.  ALJ Lemoine stated that these opinions were not supported by the objective signs observed by Dr. Goriganti.  R. at 20-21.  Finally, ALJ Lemoine assigned less than controlling weight to Ms. Salmonsen's opinions, which were not well supported by objective symptoms.  R. at 21.  However, Ms. Salmonsen's opinion "was duly considered."  Id.

Plaintiff argues that ALJ Lemoine has failed to properly develop, assess, and weigh the medical evidence in the following ways: (1) by discounting an unspecified treating physician's opinion for being based on subjective complaints; (2) by failing to clarify the opinions of a consultative physician, unspecified but indicated to be Dr. Mescon, (3) by affording greater weight to opinions offered by physicians other than the consultative and treating sources, who were in

agreement; (4) by accepting an opinion from Dr. Kuthuru that Plaintiff was not disabled; and (5) by affording greater weight to nonspecific opinions than specific opinions, neither specified by Plaintiff. Pl.'s Br. at 11-15. Defendants counter that treating sources are not necessarily entitled to the greatest weight, that an opinion that Plaintiff was not disabled was properly subject to careful consideration before it was given any weight, and that the weight given to various sources was directly related to their consistency with the record as a whole. Def.'s Br. at 12-15.

Plaintiff's first argument is wholly premised on Nix v. Astrue, No. 07-CV-344, 2009 WL 3429616 (W.D.N.Y. Oct. 22, 2009), which she claims reversed an ALJ's decision for rejecting medical opinions based on subjective complaints. Pl.'s Br. at 11. However, Plaintiff mischaracterizes the holding of Nix, which reversed the ALJ's conclusion regarding "the basis on which these *physicians* produced their reports." 2009 WL 3429616, at *9. Plaintiff's argument refers to ALJ Lemoine's consideration of Plaintiff's own testimony, which is an issue of credibility and thus legally distinct from Nix. Since the Court has already addressed the issue of Plaintiff's credibility, this argument is without merit.

Plaintiff's second argument is that the ALJ should have clarified the opinion of Dr. Mescon with respect to her medical source statement, which noted that "there are no limitations in the claimant's ability to sit or to stand for short periods of time." R. at 363. ALJ Lemoine specifically mentioned this language in his decision and determined that it was consistent with Plaintiff's own testimony that she could clean, do laundry, do dishes, vacuum, and grocery shop. R. at 20. The Court therefore finds that ALJ Lemoine's finding that Dr. Mescon's opinion was entitled to great weight was supported by substantial evidence and is not subject to remand.

Plaintiff also alleges that consultative and treating sources were improperly given less

weight than other sources. However, the sources directly considered by ALJ Lemoine appear to be the four treating and consultative sources that form the vast majority of the record: Dr. Kuthuru, Dr. Mescon, Dr. Goriganti, and Ms. Salmonsen. R. at 19-21. Furthermore, the only consultative source, Dr. Mescon, received great weight. R. at 20. Plaintiff has not identified which sources are the consultative or treating sources that have erroneously been given less weight, or which sources have improperly received more weight. Pl.'s Br. at 13. Therefore, Plaintiff's third argument is without merit.

Plaintiff objects to the great weight afforded to Dr. Kuthuru as improper, as ALJ Lemoine appears to directly credit Dr. Kuthuru's conclusion that Plaintiff was not disabled. R at 20. Plaintiff's argument also ignores the ability of an ALJ to give weight to an opinion without necessarily crediting the conclusion of the source. Here, ALJ Lemoine assigned this opinion great weight "since it is consistent with the minimal objective findings found by the physician." Id. ALJ Lemoine cites to the third page of Dr. Kuthuru's comprehensive summary, which discusses the results of his physical examination, rather than the page at which Dr. Kuthuru states that Plaintiff is not disabled. R. at 471. These indications are consistent with ALJ Lemoine properly considering Dr. Kuthuru's observations and opinions rather than crediting Dr. Kuthuru's conclusion directly. Therefore, ALJ Lemoine's decision to give Dr. Kuthuru's opinions great weight is supported by substantial evidence.

Finally, Plaintiff argues that ALJ Lemoine has given greater weight to less specific medical sources. Pl.'s Br. at 14-15. The two sources given less weight by the ALJ are Dr. Goriganti, in part, and Ms. Salmonsen. As discussed below, Ms. Salmonsen's opinion was properly considered. The portion of Dr. Goriganti's opinion not given great weight was found by ALJ Lemoine to be

inconsistent with the record as a whole, including Dr. Goriganti's own findings. R. at 20-21. Dr. Goriganti claimed that Plaintiff could not sit or stand for more than one hour combined in an eight-hour workday. R. at 466. ALJ Lemoine specifically found that Plaintiff had the ability to sit or stand for at least two hours per day based on her description of her household tasks and on Dr. Mescon's opinion. R. at 20. The Court therefore finds that the weight assigned to Dr. Goriganti's opinion was supported by substantial evidence.

### C. Nurse Practitioner as a Non-Medical Source

Plaintiff claims that ALJ Lemoine erred in referring to Ms. Salmonsen, a nurse practitioner, as a "non-medical source." Pl.'s Br. at 15; R. at 21. Defendant argues that while the ALJ used the term "non-medical source," he clearly meant to use the term "acceptable medical source," and Ms. Salmonsen's opinion was still duly considered, even if it was not given controlling weight. Def.'s Br. at 13-14.

Federal regulations consider medical sources "for example, nurse-practitioners" as well as non-medical sources as "other sources." 20 C.F.R. § 404.1513(d). An ALJ "may use evidence from 'other sources' . . . . [I]nformation from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 23929939, at *2-3 (S.S.A. 2006). "The ALJ is free to conclude that [other sources are] not entitled to any weight, however, the ALJ must explain that decision." Saxon v. Astrue, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011). ALJ Lemoine explained that he was considering Ms. Salmonsen's opinion but would not give it controlling weight due to its inconsistency with the rest of the record. R. at 21. ALJ Lemoine was entitled to give Ms. Salmonsen's opinion less weight due to its inconsistency with the remainder of the record. Given

that the weight given to nurse practitioners and non-medical sources are the same under both § 404.1513 and SSR 06-03p, the Court finds that the ALJ's error in characterizing Ms. Salmonsen's opinion as non-medical evidence is harmless and does not warrant a reversal of his decision.

In conclusion, ALJ Lemoine was correct in his determination of Plaintiff's limitations because he reasonably evaluated all of the relevant evidence and properly assessed Plaintiff's credibility. His decision is adequately explained and supported by substantial evidence in the Record.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED**.


DATED:      March 31, 2016
            Albany, New York



_____
Lawrence E. Kahn
U.S. District Judge